FILED
2016 Sep-28  PM 04:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **R & R GROUND MAINTENANCE,)** | |
| **INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NO. 2:14-CV-1764 KOB** |
| ) | |
| **ALABAMA POWER COMPANY,** ) | |
| **THE SOUTHERN COMPANY and)** | |
| **ROBERT G. GARRISON** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION</u>

This matter, alleging race discrimination in the making of a contract and brought pursuant to 42 U.S.C. § 1981, is before the court on Defendants' "Motion for Summary Judgment." (Doc. 40). The Plaintiff filed a response (docs. 48, 51, 52, 53, 70, & 71), and Defendants replied (doc. 57); this motion has received thorough briefing.

For the reasons stated in this Memorandum Opinion, the court WILL GRANT the motion. More specifically, the court WILL GRANT the motion as to the Southern Company, a holding company, because no evidence reflected that it committed any alleged discriminatory acts; the court WILL GRANT the motion as to the other Defendants, because the evidence reflected that R&R did not timely submit a bid with pricing for the Gaston, Gorgas, & Miller contract and because R&R did not establish that the legitimate, nondiscriminatory reasons for the decision on the Greene County contract were pretextual.

# I.  PROCEDURAL BACKGROUND

This case's procedural history is not complex.  However, the court has stricken certain documents and ordered that certain documents containing confidential information be sealed with redactions filed when possible.  Both parties filed under seal documents that contained pricing and other confidential information.  The Plaintiff filed under seal a document providing certain citations to the record originally omitted in his brief (sealed - doc. 62 & 66-1; redacted - doc. 63 & 65) and also filed under seal the affidavit of Ms. Lauretta Davis (doc. 61-2).  The court stuck the first-filed affidavit of Lauretta Davis because it failed to comply with Rule 56(c)(4) of the Federal Rules of Civil Procedure.  (Doc. 67).

The Plaintiff subsequently filed an amended declaration of Lauretta Davis under seal (doc. 71), to which Defendants filed no objection.

# II.   STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering

evidence showing no dispute of material fact or by showing that the non-moving party's evidence

fails to prove an essential element of its case on which it bears the ultimate burden of proof.

*Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support

its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine

issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that

there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats &*

*Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not

significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are

material and which are irrelevant. *Id.* at 248.  In responding to a motion for summary judgment,

the non-moving party "must do more than simply show that there is some metaphysical doubt as

to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by

the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P.

56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28

U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to

assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving

party need not present evidence in a form admissible at trial; however, he may not merely rest on

his pleadings."  *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999)

(citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'"  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving

4

statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

### III. Legal Standard for § 1981

R&R claims the Defendants violated § 1981 by denying it "the same right . . . to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981. A successful § 1981 claim requires proof of *intentional* discrimination on the basis of race. *Brown v. Am. Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir. 1991). The framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and its progeny apply to analyze the circumstantial evidence allegedly establishing race discrimination in Title VII cases and § 1981 cases. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 185-87 (1989), *superceded on other grounds by statute,* Civil Rights Act of 1991, 105 Stat. 1071 (1991), *as recognized in CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 449 (2008); *Brown,* 939 F.2d at 949.

Under the first step of that framework, a plaintiff must establish a *prima facie* case of discrimination by showing "that the plaintiff is a member of a minority group, that he submitted an application or bid which met the requirements for an available contract, that the application or bid was ultimately rejected, and that the contract was eventually given to an individual who is not a member of a protected class." *Brown,* 939 F.2d at 949. If a plaintiff establishes a *prima facie* case, the defendant next has a "burden of production" but not of persuasion: it "must come forward with evidence demonstrating legitimate, nondiscriminatory reasons for its conduct." If the defendant satisfies this production obligation, then "it is incumbent on the plaintiff to produce evidence suggesting that those reasons are merely a pretext, the real reason for the action having

been based on race." *Id.*

In this case, R&R has sued not only the companies with whom he sought to contract, but also an individual who was allegedly involved in the bid process on those contracts. Section 1981 subjects individuals to personal liability for race discrimination when their actions interfered with the right to contract even though the individual himself is not a party to the contract. *See Faraca v. Clements,* 506 F.2d 956, 959 (5th Cir.)[1] ("[A] third party's interference with those rights guaranteed under Sections 1981 and 1982 will subject such a person to personal liability."), *cert. denied,* 422 U.S. 1006 (1975); *Leige v. Capitol Chevrolet, Inc.* 895 F. Supp. 289, 293 (M.D. Ala. 1995) ("Unlike Title VII, however, individual employees can be held liable for discrimination under § 1981 . . . ."). Defendants have not argued that § 1981 liability cannot cover claims against individuals who are not parties to the contract, although they have challenged Garrison's liability on other grounds.

## IV.  FACTS

This case revolves around bid contests for two landscape management projects. The Plaintiff, R & R Ground Maintenance, Inc., asserts that Defendants—Alabama Power Company, The Southern Company, and Robert G. Garrison—failed to award to R&R the contracts because its owners are African-American. Defendants deny that the decisions were based on race.

### A.  The Parties

No dispute exists regarding the relationship among the Defendants. Defendant The Southern Company ("SoCo") is an electric utility holding company, with no employees.

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(*en banc*), the Eleventh Circuit adopted as precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

SoCo has several subsidiaries, including Defendant Alabama Power Company ("APCo") and Southern Company Services, Inc. ("SCS").  SCS provides shared engineering, management, administrative, operational, and other services to the subsidiaries of SoCo, and SCS employs Defendant Robert G. Garrison as a Supply Chain Management Team Leader.  Garrison reports to Bill Allen, Engineering and Construction Services Contracts Manager for SCS, and the two groups that Allen and Garrison lead are the groups that oversee the bid process for securing contractors to provide certain  maintenance services to APCo's electricity generating plants.  Mr Garrison handled the bid process on the Greene County contract because the assigned contract agent was out of the office.

The African-American owners of R&R, Earnest and Patricia Rayford, owned R&R Cleaning Service before that company was converted in 2006 into the lawn and maintenance company that is the Plaintiff in this lawsuit.  R&R Cleaning had a history of receiving contracts with APCo, bidding on and receiving four APCo contracts before the conversion.  R&R Cleaning was twice awarded janitorial contracts at one of the APCo plants involved the current bidding, the Greene County plant, with the same African-American assistant plant manager involved as in the current bidding.  R&R, whether as a cleaning company or as a lawn maintenance company, has been included on twenty-nine bid lists for janitorial or landscape contracts that Defendant Robert Garrison's group has put together, and, for the twelve Inquiries that Garrison himself issued, R&R was included in ten.  Of those ten, three were cancelled with no award.  Of the remaining seven, R&R chose not to bid on one, and was *not* the low bidder on the remaining six jobs.  Two of the seven contracts awarded went to an African-American owned company.

### B.  APCo's Goal of Supplier Diversity

According to APCo, supplier diversity is one of its major corporate goals; its initiatives are designed to provide business opportunities for small and "diverse" businesses, including minority-owned and woman-owned businesses.  For example, "APCo spent more than $520 million in 2014 with small, minority, and diverse businesses.  In 2014, Alabama Power spen[t] more than $53 million, specifically with minority and small disadvantaged businesses." (Doc. 42-13, at 3).  The bidding process is designed to encourage the inclusion of diverse suppliers on a bid list, but, from that point on, a diverse supplier is expected to compete on quality, reliability, and price with no additional preferential treatment.

### C.  General Bidding Process on Maintenance Contracts

*Options to Obtain Supplier Contracts*

An APCo plant's designated representative may invoke the bidding process when a maintenance contract is about to expire or if a new service is needed.   When an existing maintenance contract is about to expire, depending upon the amount and type of the contract, the plant has three options: "rebid the contract, let the contract expire, or extend the contract on a sole source basis," which means rehiring the same contractor.  (Doc. 42-8, at 5).  For contracts over or near $250,000.00, the preferred method is to open the contract for confidential sealed bidding, although the plant may "sole source" such a contract with approval.  Requiring that bid proposals be sealed and subject to strict deadlines is important for the integrity of the bidding process, because a contractor with access to another bidder's proposal form and its pricing would gain an incredible advantage, as it could use that information to underbid its competitor.

*First Steps: List of Invited Suppliers & Inquiry Package*

When the decision is made to bid or rebid the contract, the next step in the process is to put together a bid list. The contract agent assembles a list of potential contractors by working with plant management and APCo's diversity program, which identifies diverse suppliers for various projects. The potential contractors on that list are known as the "Invited Suppliers." The responsible contract agent, with input from the plant, develops an Inquiry Package to send to the Invited Suppliers, and the package would include such information as general and technical specifications; general conditions of the contract; a proposal form; and instructions on submitting the proposal.

The Inquiry Letter accompanying the package contains information specific to that Inquiry, such as the date of a mandatory pre-bid meeting and the date and time deadline for submitting bids. The Inquiry Letter also contains the following standard language:

- The Inquiry package, including the Specifications, General Conditions of the Contract and Proposal Forms, all for your use in submitting a proposal for the subject work, are attached.
- Your Proposal must be submitted in exact conformance with the proposal form as part of this Inquiry.
- All proposals must be submitted by the due date and time in order to be considered.
- Any proposals received after this time or not meeting the criteria as specified will be rejected.
- After submission of your proposal through the Southern Company Sourcing web site, but before the bid due date, a copy of the proposal should be faxed to[2] [telephone number].
- IMPORTANT: If, for <u>whatever</u> reason, your proposal is not loaded into the Southern Company Sourcing web site by the due date and time, and you have not faxed your proposal as herein instructed, your proposal will not be considered.

---

[2] One of the Inquiry Letters relevant to this case inserted here the additional words "my attention at."

9

- • Enclosed are copies of the Southern Company Statistical Data Form, the Southern Company Contractor Compliance Background Form, and the Southern Company Supplier Questionnaire.  Please return the completed forms to us with your proposal.  Receipt of the completed forms is a pre-condition to consideration of your bid for this contract.

(Doc. 42-8, at 6 ¶ 14 & 18; Doc. 42-7, at 112) (emphasis in original).

*Submission of Bids*

The preferred method of submitting a proposal form is through Emptoris, an electronic website that a third-party vendor runs.  Invited Suppliers set up accounts with Emptoris, and Emptoris then gives them limited access to specific portions of the site.  After logging into Emptoris, Invited Suppliers can retrieve the Inquiry Package and other documents that the Supply Chain Management group overseeing the bid process provides to Emptoris, including detailed instructions on how to use Emptoris.  Invited Suppliers can upload their proposal electronically to Emptoris at any time, but, to finalize their bid, they must click on a red button that says "submit Draft Bid."

After the deadline for submitting bids has passed, if the supplier has submitted a bid, the contract agent can click on a paperclip icon next to the name of an Invited Supplier to open that Invited Supplier's bid.  After the deadline, if the supplier has not submitted the bid and the bid remains in draft form, the contract agent cannot access a draft bid on the specific Emptoris page set up to receive bids for a particular Inquiry; the agent has no access because no paperclip icon appears next to the bid after the deadline.

At some point in 2013 (the evidence does not reflect exactly when), a glitch occurred in the Emptoris system that allowed documents, including draft bid(s) to be sent to what Garrison called "an event [folder]," but which is not the folder designed to receive bids for an Iquiry.  The

10

bid process was designed for all bids related to an Inquiry to be uploaded and submitted to the

that Inquiry folder; if Emptoris is working properly, draft bids should not be available for

contract agent access in any folder, either before or after the deadline, because they are in draft

form only.  However, because of the glitch, a bid that was sent to this event folder would be

accessible, even in draft form.  If a draft bid were sent to that event folder and if a contract agent

knew to look in the event folder, even draft bids would be accessible.

In addition to submission through Emptoris, other acceptable methods of submitting a

proposal include via fax, mail, or hand delivery.  If the proposals are submitted through these

methods and not through Emptoris, Pam Garner, an administrative assistant in Garrison's group,

keeps the proposals locked in a safe place and will not give them to the responsible contract

agent until after the bid due date and time.  Email is not an acceptable method of submitting a

proposal; bids submitted by email are automatically rejected, as this method destroys the

confidentiality and integrity of the closed bid process.

According to Defendants, despite any standard language to the contrary in the Inquiry

Letter, the only document that the Invited Suppliers are required to submit by the due date and

time for sealed bids is the proposal form with the economic pricing part of the bid package.

Pricing is the most important factor that the plant considers in the bidding process.  Any Invited

Suppliers who do not complete and timely submit this proposal form are automatically

disqualified.

According to Defendants, documents other than the proposal form—such as licenses,

insurance, schedules, and compliance forms—can be submitted following the close of the bid

deadline, and the failure to submit those forms by the deadline does not disqualify an Invited

Supplier from consideration.  The reason Defendants give for this distinction is that the pricing is generally the key factor upon which Defendants make the selection and is also the component requiring confidentiality to ensure that other contractors do not receive an advantage.  *See* Garrison Dep. Doc. 42-8, at 10.

Defendant Garrison is only aware of one time in his tenure of over 15 years when APCo accepted a late proposal form for a bid.   That one-time exception occurred around the year 2000 when APCo first began using an electronic system and *before* it had determined a policy regarding how to handle bid proposals for which the uploading process had begun but had not been completed by the deadline.  On that occasion, the Invited Supplier had evidence through a receipt that it had uploaded something into the system, which was the predecessor to Emptoris, but Supply Chain Management overseeing the bid could not access what it had uploaded. Having never encountered that problem before and having no policy in place to address it, Supply Chain Management accepted the late bid proposal on that one occasion.  Subsequently, Supply Chain Management instituted a policy for APCo bids that disallowed any exceptions to timely, complete submission of the proposal form, and added language to the Inquiry Letter stating that the proposal had to be submitted by the deadline.

Since instituting the policy, Supply Chain Management has never accepted, on APCo's behalf, a late bid proposal form and has never awarded a contract to a contractor who did not submit a timely proposal form through one of the acceptable submission methods.  After 2000, Garrison's group has disqualified several Invited Suppliers for failing to submit timely bid proposals.  For example, in an unrelated bid project, Lonestar Shelter Manufacturing, a non-diverse company, *emailed* a copy of its proposal for a contract, which Garrison's group rejected.

12

As another example, for an unrelated project, Siemens, a non-diverse company, submitted its proposal form *late*, and Garrison's group rejected it.  (Garrison Decl. Doc. 42-8, at 10 ¶ 24).

However, Supply Chain Management has allowed an Invited Supplier *who has timely submitted a bid proposal* form to submit *other* documents after the close of bidding without disqualification.  For example, in a bid project unrelated to this claim, Jett Construction, a non-diverse company, submitted compliance forms after the bid deadline without disqualification and received the contract.  (Garrison Dep. Doc. 42-8, at 11, ¶ 27).

> *Bid Tabulation*

After the bid deadline, the contract agent takes the timely submitted proposal forms and tabulates the overall price of the bids.  Joe Shannon, the contract agent for the Gorgas plant, testified that

> [t]he way a proposal is tabulated depends on the nature of the contract and whether it involves firm (or fixed) price work, payment for time and materials ("T&M"), or unit pricing.  This is a decision of both the plant and contract agent that is made when the Proposal Form is put together before being sent out with the Inquiry Package.

(Doc. 42-8, at 11 ¶ 28).

The contract agent sends the bid tabulation to the plant, and plant management makes the final decision regarding which Invited Supplier will be awarded the contract.  Price is the primary consideration and carries the most weight; however, plant management may consider other factors, such as the complexity of the project and previous experience with a particular contractor.

> *Contract Award Notification*

Once the plant approves the award of a contract, APCo sends out a letter informing the

bidders of the award and who finished first, second, and third, but not identifying the amount of

the winning or losing proposals because of the confidential nature of this information.  APCo and

the successful bidder then sign the contract.

### D.  Gaston, Gorgas, & Miller Contract

One specific contract whose bidding process R&R challenges as discriminatory is the

contract for landscape maintenance at three generating plants: E.C. Gaston, Gorgas, and Miller

("GGM contract").   In the Spring of 2013, the previous landscape maintenance contract for those

plants was expiring.  Joe Shannon is a contract analyst for APCo, and is the contract agent for

maintenance contracts and/or purchase orders assigned to the Gorgas plant. He consulted with

plant management and put together a bid list for the GGM contract, selecting four Invited

Suppliers:  Landcrafters, Inc. (a woman-owned small business that had performed the expiring

GGM contract); Diversico, Inc. (whose diversity status was not identified, despite its name);

Forestree Network Services (a Hispanic-owned business), and R&R.

The proposed contract was identified as Inquiry No. 13-20359-MB-APC.  APCo bid the

proposals collectively because it wanted the economic benefits of a larger scale contract and

consolidation of work unless the proposals reflected a significant difference in price for a

particular plant that would warrant separating that contract from the others.  The Specification in

the GGM Inquiry stated:  "Purchaser, at its option may elect to award all of the work described

herein to one Contractor or award the work at each Plant to a different Contractor.  Contractor

shall include in its Proposal a discount off its rates if awarded work at multiple Plants."  (Doc.

42-7, at 18, § 1.2).

The Inquiry Letter for the job specified the dates of the mandatory pre-bid meetings and

14

stated that the bid proposal due date was November 6, 2013 at 11:00 AM CDT.  The letter also contained the standard language for Inquiry Letters previously quoted, including the language stating that proposals received after the due date and time would be rejected and that, before the bid due date, the contractor should fax a copy of the proposal as a back-up.

The Inquiry Package included not only this Inquiry Letter, but also General and Technical Specifications, General Conditions of the contract, and the Proposal Form. (Doc. 42-7, at 113-199).  Although the package contained over ninety pages, the proposal form itself was a six-page document.  (Doc. 42-7, at 194-99).

Shannon conducted pre-bid meetings on October 24 and 25, 2013, both of which were mandatory.  Because Forestree did not attend the mandatory meetings, APCo disqualified that company; however, the other three Invited Suppliers sent representatives.  At the beginning of one of the pre-bid meetings, Shannon stressed the importance of submitting a bid by the deadline:

> If you don't get your bid in by eleven o'clock, you can't submit a bid through [Emptoris] . . . . So, don't wait until the last minute to upload your bid . . . .[I]t can be kind of peculiar or it's not the most user-friendly system as far as uploading . . . . [I]f you are having problems with it, there's a toll-free number, it should be in the package y'all got for the help desk.
> * * *
> We ask that you fax a copy of your bid in.  It serves as a backup.  Again, don't wait until the last minute to fax it.  That's one fax machine used by a lot of people and most people are up and are faxing bids in.  You just have to get in line and wait and if you don't get in by eleven o'clock, I can't accept that either.

(Doc. 42-7, at 7 ¶ 15).

On November 5, 2013, the day before the bid submission deadline for the GGM contract, Invited Supplier Landcrafters successfully submitted a proposal for that contract at 4:41 PM.

15

At 10:23 AM on the day of the bid deadline, November 6, 2013, an email from Emptoris advised Ernest Rayford of R&R that R&R's application package for Inquiry No. 13-20359-MB-APC had been successfully *uploaded*.  It did not say, however, that the uploaded document had been *submitted*. At 10:30 AM, he received a second email from Emptoris advising that the application attachment uploaded at 10:23 AM had been "updated."  Rayford had not performed any action since the upload that would have updated the document.  He logged back into the Emptoris system, but found that he was unable to open the bid application package. Next, Rayford called the Emptoris number and spoke with an Emptoris Customer Service Specialist who confirmed that the bid application package was present in the system, but also confirmed that it could not be opened. The Representative suggested that he try to log in with a new username and password, which he received from the Representative at 10:49 AM; however, Rayford still was unable to open the bid application package.  Because the Inquiry Letter gave submission via fax as an alternative, R&R attempted to fax the bid application package at least four times prior to the expiration of the 11:00 AM deadline, but each time R&R received an error notification.  At 11:00 AM, he received an email notification from Emptoris advising that the Inquiry was "closed for bidding."  (Doc. 2-1, at 8-9).

On November 6, 2013, before the 11:00 AM deadline, Shannon logged into Emptoris and saw that R&R's bid was still in draft form.  He tried to call R&R at various phone numbers and finally succeeded in getting in touch with the owners' son, Demetrius Rayford, advising him that the bid was still in draft status, and that R&R needed to push the red button that said "Submit Draft Bid."  After the bid deadline of 11:00 AM passed, Shannon logged back into Emptoris and found that the Landcrafters' status read "Submitted" and R&R's status still read "Draft."  A

screen shot of the Emptoris page for the GGM bid on November 6, 2013 after 11:00 AM shows

the bids closed, with Landcrafters' status "Submitted" and R&R's status "Draft."   (Doc. 42-7, at

228-30). Because of  Landcrafters' "Submitted" status, Shannon could click on the

accompanying paperclip showing sixteen attachments that comprised Landcrafters' bid.

However, because of R&R's "Draft" status, no paperclip was displayed for Shannon to click on

and access R&R's material.  As Diversico had not prepared a draft and had not submitted a bid,

and APCo had previously disqualified Forestree, Landcrafters was the only company that had

successfully submitted a timely bid.

Shortly after the 11:00 AM deadline, Ernest Rayford, or someone on behalf of R&R,

faxed a blank sheet of paper to the same number as before, and this fax went through without

incident.  Rayford then attempted to call Defendants to ensure that the bid had in fact uploaded

into the Emptoris system, and he left a voice mail message for Allen, but he did not receive a

return call from any of Defendants' management personnel after 11:00 AM until that evening.

At 11:39 AM on November 6, 2013, thirty-nine minutes after the deadline, Shannon

received a fax from R&R consisting of a few blank pages.  R&R had not successfully submitted a

fax before the deadline.

In an email dated November 6, 2013 at 2:28 PM, Shannon informed R&R that he would

not consider its bid because R&R failed to finalize that bid in Emptoris and had failed to send a

bid via fax prior to the deadline, either as a back-up or as the primary bid submission.  Because

Landcrafters was the only company to successfully submit a bid, Shannon created a cursory

tabulation of the bid and notified plant management.  In light of Landcrafters' satisfactory

performance of the previous GGM contract for a reasonable price and in light of the absence of

other bids, the three plants approved the award of the GGM contract to Landcrafters.

At 7:26 p.m. on November 6, 2013, Rayford received an email from Shannon, copying Garrison and Allen, and stating as follows:

> Bids for the above referenced Inquiry were due at 11:00 A.M. today.  The bid you uploaded into Emptoris was not changed from a draft status before 11:00 A.M., thus at 11:00 A.M. it went away.  The fax you submitted was late and the pages were blank.  Therefore, I did not receive a bid from you for this work.  Per our policy, I can't consider a bid not received by the bid due date & time.  I appreciate the time and effort you put into this inquiry.

(Doc. 52-1, at 10).  Garrison sent a "Reply All" response to this email and stated:  "Bill[,] [t]he Inquiry cover letter clearly details these requirements[.]" ( Doc. 52-1, at 13).  Rayford received no further communication on behalf of Defendants regarding the GGM contract.

After the filing of this lawsuit in 2014, Garrison recalled that a glitch had occurred with Emptoris that Defendants had discovered and resolved in 2013 after the GGM contract. Remembering that glitch, Garrison searched various folders in Emptoris and located R&R's bid, titled "Miller, Gorgas, Gaston," designating Inquiry 13-20359-MB-APC, in a folder "at the Event level" that contract agents would not look in when reviewing bids in Emptoris.  The screen shot of that folder shows an R&R document sent on November 6, 2013 at 10:30 AM. Garrison testified that he could open the bid in this particular folder, although it was still listed in draft status.  (Doc. 52-3, at 5 p. 85; screen shot-Doc. 52-5).

R&R points to this evidence and argues that Garrison or perhaps others could have accessed and considered the R&R bid, if they had chosen to do so, since R&R had attempted to submit the bid by the deadline.  However, no evidence[3] exists that on November 6, 2013,

---

[3] R&R points to Shannon's tabulation of Landcrafters' bid with another column started to the left, and suggests that this could be evidence that Shannon did indeed access R&R's bid in

18

Shannon, who made the decision, or Garrison knew about the glitch and had a reason to search beyond the Emptoris page showing the bids.

After the filing of this lawsuit in 2014, and perhaps after realizing that R&R had indeed tried to submit a proposal that had gone astray, Shannon says he conducted a full tabulation of the proposals of Landcrafters and R&R, as he would have done if competing proposals had been timely submitted.  He estimated the number of cuts (presumably grass cutting) or other work needed per year and multiplied that number by the contractor's stated unit price; however, Shannon merely provided the totals without providing the calculations themselves.  His failure to state the estimated number of cuts and sprays at each area makes reconstructing that analysis difficult.  According to Shannon and the totals set out in his sealed declaration, his calculations for the annual proposals showed that R&R's bid for each plant and for the combination of all three plants was significantly higher than Landcrafters' bid.  (Doc. 41-7).  Accordingly, Shannon testified that if R&R's bid had been submitted in a timely manner, R&R would not have received the GGM contract award or the contract for any of the three individual plants, if APCo had decided to separate any of the plants from the multi-plant contract.

In the amended declaration of Lauretta Davis, who is a paralegal for R&R's counsel, she

---

November of 2013, considered it, and began to tabulate its bid proposal.  However, Shannon testified that the second column was a comparison between Landcrafters' pricing on one plant versus all three, and had nothing to do with R&R's draft bid, which he did not access; R&R's name is crossed out at the top of the column because it was not R&R's pricing. (Doc. 42-7, at ¶ 22).  Further, the comparison of the numbers in the right column on the tabulation and R&R's bid proposal numbers accessed after the lawsuit's filing reflect that the column numbers in the tabulation do not correspond with R&R's draft bid pricing.  (Compare  Doc. 42-8, at 198-205 (redacted); Doc. 44-8, at 3-10 (sealed) with Doc. 53-3 (sealed)).  Therefore, this document cannot serve as evidence that Shannon, or anyone else on behalf of APCo, accessed R&R's bid for the GGM contract before the filing of this lawsuit.

performed calculations on the bids submitted by R&R and Landcrafters on the Miller Steam

Plant job, one of the three plants that comprised the GGM contract.  Ms. Davis states that, by

her calculations,  R&R's bid regarding work for the first year would have been lower than

Landcrafters' bid regarding work for the first year.  In the declaration,  Ms. Davis did not

attempt to calculate the bids on the other two plants or the combined total for all three. (Davis

Decl. Doc. 71-1 ).

### E.  Greene County Contract

In August 2013, APCo decided to re-bid the maintenance contract for the Greene County

Electric Generating Plant in Demopolis, Alabama.  At the time of this decision to bid the job,

the plant had enjoyed a long-standing, positive relationship with the contractor performing the

maintenance work:  DKH, LLC.   That relationship dated back to the late 1990's, when Don

Parsons, one of the Caucasian owners of Parsons Lawn Service now known as DKH, helped

perform work for the company having the landscape maintenance contract.  Parsons then

assumed full control of the contract when the other company bowed out.  Throughout the next

decade and a half, Parsons/DKH performed the maintenance work at the plant except for a seven

month period around 2004 when the plant awarded the contract to an African-American owned

company named United Services Associates; however,  the parties mutually terminated that

contract in recognition that the job was more than United Services could handle.  At the

termination of the contract with United Services, the plant management asked DKH to resume

handling the project, because DKH had a history of performing the job well.  DKH won the next

Greene County maintenance contract in 2006 and continued to perform the contract up to the re-

bid process in 2013, challenged here.

According to Mike Willingham, an African-American Assistant Plant Manager, and Danny Dobbs, a Caucasian Senior Engineer at the plant, DKH was a model company, working hard with a can-do attitude for a low price. When Dobbs or Willingham called DKH for assistance, the answer was always "yes, sir." (Dobbs Dep. Doc. 42-9, at 44-45; Dobbs Decl. 42-10, ¶ 3; Willingham Decl. Doc. 42-12, ¶ 3). The company also provided the added quality of convenience; because DKH was located close to the plant, it could provide necessary manpower within thirty minutes of being contacted, extremely helpful when coal spills or other emergencies occurred. Further, DKH performed services for the plant in addition to landscaping and lawn care: it performed the hard and time-sensitive work of washing the precipitator patio and the belt line, as needed. For all of these reasons, the Greene County plant management was more than satisfied with DKH's performance.

Given that satisfaction, the plant management could have sought approval in 2013 for DKH to continue doing the maintenance work as a sole source. However, Willingham and Dobbs decided to open the contract for bidding in 2013 because the work appeared to be approaching $250,000 per year, and, given the size of the contract, they thought putting the contract up for bid would be more fair. Dobbs and the Supply Company Management contract agent for the Greene County plant, Nikki Tinker, an African-American, put together Inquiry No. 13-26606-C-APC. At Willingham's request, Dobbs prepared the Technical Specifications to include not only landscaping and lawn care, but also vegetation control and some tasks that DKH had previously performed outside of lawn care, such as washing down the precipitator patio, washing the conveyor belt and general plant clean up. Following the pre-bid meeting, the technical specifications were revised to require a thirty minute response time for clean up of the

21

precipitator patio, the conveyor belt, and the general plant.

Using a 2006 list of bidders, Tinker worked with Dobbs to assemble the bid list of the following four Invited Suppliers: DKH, LLC (which had a Caucasian woman owner but no African-American owners), R&R, West Alabama Mechanical (a small business), and Championship Enterprises, Inc. (an African-American owned business). Willingham and Dobbs approved the list.

Although R&R had no history with lawn and maintenance at the Greene County plant, the plant had awarded R&R the janitorial contract from 2006 through 2012, twice being selected from a sealed bid process. Greene County plant management characterized R&R's janitorial work as generally satisfactory, but acknowledged having occasional issues with R&R's performance, such as trash cans not being emptied; floors not being cleaned; and damage occurring to the floors from the cleaning solution. When the plant re-bid the janitorial contract in 2012, R&R lost the contract. Mike Willingham testified that he "did not consider R&R to have performed as impressively as DKH." (Doc. 42-12, at 6 ¶ 11).

R&R also had a history of being included in bid lists for janitorial and landscape contracts by Garrison's group: it was on twenty-nine such bid lists, and had been on ten of the twelve inquiries that Garrison issued for janitorial or landscape work since 1997. Of those ten inquiries, three were cancelled with no award made, two were awarded to an African-American owned company, and for one R&R did not submit a bid. According to Defendants' calculations, R&R was not the low bidder on any of those contracts where an award was made. One contract that did not include R&R on its bid list was awarded to an African-American owned business.

On October 1, 2013, Supply Company Management sent an Inquiry Package for a three-

year lawn and maintenance contract on the Greene County plant to the four Invited Suppliers.
The Inquiry Letter set the pre-bid meeting for October 3 and the bid due date as October 11,
2013 at 11:00 AM CDT.   Although the pre-bid meeting date and bid deadline were specific to
the Inquiry, the Greene County Inquiry Letter contained the usual standard language,[4] including
the following:

> Any proposals received after [the Bid Due Date and Time] or not meeting the
> criteria as specified will be rejected.
> ***
> Enclosed are copies of the Southern Company Statistical Data Form, the Southern
> Company Contractor Compliance Background Form, and the Southern Company
> Supplier Certification.  Please return the completed forms to us with your proposal.
> Receipt of the completed forms is a pre-condition to consideration of your bid for
> this contract.

(Tinker Decl. Doc. 42-11, at 5 ).

The Inquiry Package included a document entitled "Specifications for Ground
Maintenance," which listed the scope of the work in section 2.0 in pertinent part as follows:
"The Contractor . . . shall perform landscape maintenance operations, vegetation control,
conveyor belt wash-down, precipitator patio wash-down, and general plant clean up at the
Purchaser's Green County Steam Plant."  (Tinker Decl. Doc. 42-11, at 53).  The section
numbered 3.3 and entitled "Landscape Maintenance,"  listed, among others, the following tasks:
"Maintaining flower beds and shrubs," "Destroying ant beds and wasp nests," and "spraying weed
killer (Roundup) as mutually agreed."  *Id.* at 55.  In the "General Requirements" sub-section of

---

[4] The language quoted on pages 9-10 of this Memorandum is identical to that in this
Greene County Inquiry Letter except that, in the Greene County letter, the sentence stating that a
copy of the proposal should be faxed to a certain telephone number is changed to say "faxed to
my attention at [telephone number]," and the Greene County letter also emboldens many of the
sentences quoted.  (Doc. 42-11, at 5).

Landscape Maintenance, the following sentence appears:  "Fire ant and other pesticides and herbicides shall be applied by the Contractor on an as needed basis."  *Id.* at 56.

At the end of another section of the Specifications, section 3.4 entitled "Vegetation Control," the following language appeared:  **"Contractor shall furnish with its Proposal evidence that it possesses all appropriate licenses required for application of pesticides, insecticides, herbicides and rodenticides, as well as any other applicable licenses required by the state related to the landscaping services hereunder."**  (Tinker Decl. Doc. 42-11, at 57) (bold in original).  On those Specifications, the bulk of the general, routine work under the headings Landscape Maintenance and Vegetation Control, was listed as "Firm Price." The work listed as "Cost Plus" involved three specific tasks that would be performed on an "as requested" basis:  Precipitator Patio Clean Up, Conveyor Belt Clean Up and General Plant Clean Up.  *Id.* at 52- 60).

The task of spraying pesticides, insecticides, herbicides, and rodenticides was a new task added to the 2013 Greene County maintenance contract.  (Garrison Dep. Doc .  pp. 32-33.).

Because Tinker was out of the office, Garrison conducted the pre-bid meeting for the Greene County contract on October 3, 2013.  Championship Enterprises elected not to bid on the contract and did not attend the pre-bid meeting.  Garrison told the representatives of the other three Invited Suppliers that they must submit the pricing portion of the proposal form by the deadline.  He stated that some other forms could be provided later:

> I told the Invited Suppliers that they "just need the pricing portion of the proposal form and those compliance forms.  You got other things that you need to attach to that, that's fine.  You can get that to us later.  We'll be glad to take that afterwards, but we do have to have the pricing and the, pricing portion before that 11:00."

24

(Garrison Decl. Doc. 42-8, at 13, ¶ 32).

Ernest Rayford of R&R testified that at this mandatory meeting, "it was made clear that it was incumbent on the contractors to check with the State of Alabama and to submit the required licenses to spray and handle chemical setting." (Doc. 52-1, at 2-3).  Garrison acknowledges that he told the Invited Suppliers that they were required to determine what permits they need to do the job and secure those permits.  (Garrison Decl. Doc. 42-8, at 18).

By October 11, 2013 at 11:00 AM, all three of the remaining Invited Suppliers—DKH, R&R, and West Alabama Mechanical—had submitted a proposal form.  R&R and West Alabama had timely submitted their bids through Emptoris.  (Doc. 52-2, at 2).  DKH had timely submitted its bid via fax two days before the deadline; although its bid remained in "Draft" status on Emptoris, the timely receipt of the bid via fax meant that it was not disqualified.

After 11:00 AM on October, Garrison reviewed each of the three proposals.  DKH had not submitted its licenses or compliance forms with its proposal.  R&R had done so, and R&R had a license to perform the required application of pesticides, etc.

Sometime that same day, after the bid deadline passed, Garrison contacted Don Parsons at DKH via telephone, and DKH faxed him its compliance form later on October 11, but the license issue remained.  DKH told Garrison that it would contact the Department of Agriculture to see what license, if any, was required to perform the required vegetation spraying, and would provide any required licenses.  For a time, DKH took the position that no license was required to perform that work.  (Tinker Decl. Doc. 42-11, at 4, ¶. 5).  However, no dispute exists that the Alabama Department of Agriculture required a license for the performance of the work specified in the Greene County contract for application of pesticides, insecticides, herbicides and rodenticides.

25

(Doc. 61-1, at 20; Doc. 57, at 2). Further, no dispute exists that, as of the bid deadline, DKH did not possess such a license. *Id.*

By early afternoon on October 11, 2013 Garrison determined that DKH had the lowest bid, and was, in fact, significantly lower by his tabulations than R&R, the second lowest, and West Alabama, who came in third. (Doc. 42-8, at 14 - redacted; Doc. 44-12, at 14 - sealed).

In making his calculations, Garrison only took firm price work into account and did not consider the contractor's labor rates ("T&M") when evaluating the price of this particular bid. He testified that "T&M [Time and Material] work was not expected to be a large part of the contract, as Greene County had only planned on a test run of burning PRB coal." (Garrison Decl. Doc. 42-8, at 14, ¶ 37 ). The cost-plus work listed in the contract was cleaning the plant, conveyor belt and precipitator patio as requested,[5] and R&R's hourly rates were less than DKH's hourly rates on the cost-plus work. Calculating both types of work, firm price and cost-plus, would have enured to R&R's benefit. However, the fixed price work was obviously easier to calculate, because it was simple addition, whereas calculating cost-plus work for "as requested" tasks would require some effort to accurately forecast the amount and extent of such tasks based on past records. No evidence in the record reflected that APCo had previously gone through records to make such a forecast.

---

[5] R&R's response 24 states that the "cost-plus work [was] where majority of the funds were spent." (Doc. 61-1, at 6 (sealed) and citing to Doc. 53-2, at 9-10 (sealed)). The citations listed after that statement support that statement *if* all cleaning items represent cost-plus work, but those statements are for 2014 and 2015, after the 2013 contract, and do not establish what APCo's reasonable expectations were in 2013 for future cost-plus work. One of the larger charges on the 2014 and 2015 statements was for "FH cleaning" but neither party explains what "FH cleaning" is and whether it is cost-plus work. If the FH Cleaning is cost-plus work, then the cost-plus work did represent over half of DKH's total charges in 2014 and 2015. In their brief, Defendants do not agree that the evidence supports R&R's view of these documents.

At 1:35 PM on October 11, 2013, Garrison emailed Dobbs the bid tabulation, stating that DKH was the low bid, followed by R&R. (Garrison Decl. Doc. 42-8, at 194).  The email did not specifically advise Dobbs that the tabulation included firm price work but did not include cost-plus work, and the tabulation contained no such  notation.   The email did not advise Dobbs that R&R's rates for cost-plus work were lower than those of DKH.

In the same email, Garrison noted that DKH had an issue with licensure and was contacting the Department of Agriculture to determine its requirements.  (Doc. 42-8, at 194). Garrison did not suggest awarding the contract to any particular contractor, but asked the plant management how it wanted to proceed.  Dobbs, with Willingham's approval, suggested that the plant go ahead and award the contract to DKH based on the low bid with the provision that it would  only apply herbicides that did not require a certification or license until the company obtained the necessary licensure. Willingham even suggested removing that portion of the contract, because the plant had the equipment and its own employees could perform that task. (Willingham Decl. Doc. 42-12, at 5).

However, Alabama Power Co. and Supply Chain Management did not agree with Dobbs's suggestion to award the contract to DKH and allow DKH to obtain the license later.  Defendants specifically admitted that APCo requires contractors to have the correct licenses *before* it will award a contract to them. (Defs' Br. Repl to Facts Doc. 57, at 2 Fact 22; Garrison Depo. Doc. 42-6, at 28).  Almost a month elapsed between the bid deadline and the date APCo awarded the contract to DKH, waiting on DKH to obtain the required license.  Garrison acknowledged in his deposition that he could not recall this situation arising except in the instant case:  when the winning bidder did not have the proper licenses and the Company waited on the license receipt

before awarding the contract.  (Garrison Dep. Doc. 42-6, at 32).

In light of the decision to require a license before awarding the contract, Tinker communicated with the Department of Agriculture to determine which licenses were required to perform the vegetation control in the contract.  Although Garrison had advised contractors at the pre-bid meeting that they were responsible for making such contact and securing any required licenses, Tinker initiated communication with the Department because DKH took the position that no license for chemical applications was required.   Delays occurred when DKH submitted a license belonging to a possible subcontractor, but Garrison found that submission unacceptable. Upon his supervisor's recommendation, Garrison gave DKH only thirty days to obtain a license. On October 31, 2013, twenty days after the bid deadline, DKH finally applied for the proper permit to perform this task.   On November 7, 2013, within the thirty-day period that Garrison provided, Collin Hull and Don Parsons of DKH obtained the required license.  On the next day, November 8, 2013, twenty-eight days after the bid deadline, Greene County assistant plant manager Willingham approved the award of the contract to DKH.

## V.  ANALYSIS

In their original brief supporting their motion for summary judgment, the Defendants divided their argument into three sections: (1) the argument that claims against Defendant SoCo are due to be dismissed because it is a holding company and because no evidence exists that it discriminated against R&R;  (2) the argument that the Plaintiff has not raised a genuine issue of material fact regarding race discrimination as to the GGM contract or the Greene County contract; and (3) the argument that the claims against Defendant Garrison related to the GGM contract are due to be dismissed because no evidence exists that he made the decision on that

28

contract.

### A. Claims against SoCo

The Defendants argued in section II of their brief that claims against SoCo must be dismissed because no evidence exists in the record that SoCo discriminated against R&R. Defendants presented undisputed evidence that SoCo is a holding company with no employees. R&R presented no evidence that any of the alleged acts of discrimination were performed on behalf of SoCo or that the people who allegedly committed those acts functioned as agents for SoCo. Perhaps in recognition that it had no basis for challenging the motion as to SoCo, R&R did not respond to that entire section of Defendants' brief.

The court FINDS that the motion for summary judgment is due to be GRANTED as to the claims against SoCo, because the evidence presented does not raise a genuine issue of material fact that SoCo discriminated against R&R; the court WILL ENTER SUMMARY JUDGMENT in favor of SoCo and against R&R.

As an *alternative* ruling, the court FINDS that R&R has abandoned its claims against SoCo. *See, e.g., Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned").

### B. Alleged Race Discrimination regarding the GGM and Greene County Contracts

#### 1. Analytical Framework

R&R claims the Defendants violation § 1981 by denying it "the same right . . . to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981. A successful § 1981 claim requires proof of *intentional* discrimination on the basis of race. *Brown,* 939 F.2d at 949.

Because R&R has neither alleged nor presented *direct* evidence of race discrimination, the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and its progeny applies to analyze the circumstantial evidence allegedly establishing race discrimination; although *McDonnell Douglas* was a Title VII case, Courts have applied its analytical framework to § 1981 cases as well. *See Brown,* 939 F.2d at 949.

Under the first step of that framework, a plaintiff must establish a *prima facie* case of discrimination by showing "that the plaintiff is a member of a minority group, that he submitted an application or bid which met the requirements for an available contract, that the application or bid was ultimately rejected, and that the contract was eventually given to an individual who is not a member of a protected class." *Brown,* 939 F.2d at 949.  If a plaintiff establishes a *prima facie* case, the defendant next has a "burden of production" but not of persuasion: it "must come forward with evidence demonstrating legitimate, nondiscriminatory reasons for its conduct."  If the defendant satisfies this production obligation, then "it is incumbent on the plaintiff to produce evidence suggesting that those reasons are merely a pretext, the real reason for the action having been based on race."  *Id.*

### 2. *Application of the Standard to the GGM Contract*

As to the GGM contract, Defendants argued that the Plaintiffs have not presented evidence that, if true, established its *prima facie* case.  Defendants acknowledged that R&R was an African-American owned company and that the company receiving the contract award, Landcrafters, was not.  However, Defendants argued that R&R cannot establish the second element: that it submitted a bid that met the requirements for an available contract.  Rather, Defendants asserted that the undisputed evidence reflected that R&R did not timely submit the

bid, and thus, did not meet the requirements set forth in the Inquiry Letter for successful bid submission.

The undisputed evidence reflected that R&R uploaded bid documents, including the proposal form with pricing, to the Emptoris website on the morning of the deadline; that the website reflected the uploading of those documents as a "draft"; but that R&R failed to finalize its bid by clicking the "submit Draft Bid" button by the 11:00 AM deadline.  The undisputed evidence also reflected that R&R attempted to fax the bid documents shortly before the 11:00 AM deadline, but the fax failed to go through before the deadline.  R&R did not argue that it successfully submitted a bid before the deadline; it simply argued that the evidence reflected it tried to do so, and that Defendants should have cut the company some slack and accepted the late submission.

The court looks to the other evidence to determine whether timely submission of the bid was a requirement of the contract that APCo strictly enforced or whether it treated the deadline as a suggestion more honored in the breach than the observance.  The evidence is undisputed that APCo instituted a policy in 2000 requiring the timely submission by the deadline date and time of *at least* the proposal form portion of the bid with pricing, and automatically disqualifying any contractors submitting the proposal form portion of the bid after the deadline.  The evidence is undisputed that, since instituting that policy, APCo never accepted a sealed bid when the proposal form with pricing was submitted after the deadline date and time.  Further, the evidence specifically reflected that APCo disqualified non-diverse companies who failed to submit the bid proposal form by the due date and time.   And, the evidence is undisputed that R&R did not submit the proposal form with pricing prior to the due date and time by any of the other

acceptable methods, such as mail or hand delivery.

APCo communicated its strict observance of the deadline to the Invited Suppliers bidding on the GGM job.  The Inquiry Letter for that contract specifically advised contractors that APCo would reject any proposals received after the due date and time.  R&R did not dispute that Shannon, who ran the mandatory pre-bid meeting for the GGM Inquiry, emphasized the importance of this strict deadline, and even warned them about the vagaries of the Emptoris system and the dangers of waiting too late to upload and submit proposals: "If you don't get your bid in by eleven o'clock, you can't submit a bid through [Emptoris.] . . . .So don't wait until the last minute to upload your bid . . . [Emptoris] can be kind of peculiar or it's not the most user-friendly system as far as uploading."  (Doc. 42-7, at 15-16).

The Inquiry Letter advised contractors that they should fax a copy of the proposal *before the bid due date*.  R&R did not dispute that, at the pre-bid meeting, Shannon emphasized the need to fax a copy of the bid proposal as a back-up well before the bid deadline, warning that the fax machine is busy on bid morning: "if you don't get in [the fax] by eleven o'clock, I can't accept that either."  *Id.*

The court acknowledges R&R's evidence reflecting that APCo did not disqualify all contractors who sent in various forms after the due date and time.  However, the forms accepted late were never the crucial proposal forms with pricing.  The evidence consistently reflected that, where sealed bids were concerned,  APCo accepted bids only when the proposal forms with pricing were submitted on time, and, when the proposal form was received by the deadline, the company would allow submission of *other* forms after the deadline.  Defendants explained that the reason behind the strict deadlines and the confidentiality of a sealed bid process was to

maintain fair competition and integrity:  knowing what another contractor was bidding would give an unfair advantage and allow one contractor to underbid another.   Thus, the proposal form with pricing was the key form that needed confidentiality and a strict deadline, and the evidence reflects that APCo consistently adhered to the strict deadline where proposal forms were concerned.

The court also acknowledges R&R's argument that APCo has not consistently adhered to strict submission deadlines because, in the separate Greene County bid process, the company awarded a contract to Invited Supplier DKH even though DKH did not timely submit a bid through Emptoris.  However, R&R's argument ignored the fact that DKH *did* timely submit the referenced bid, including a proposal form with pricing via fax two days before the deadline. APCo consistently stated that Emptoris was the preferred means of transmitting a bid but was *not* the only acceptable way; it repeatedly offered submission by fax as an acceptable means of transmittal.  Therefore, DKH timely submitted the referenced bid in the Greene County bid process, and R&R incorrectly raised that bid as an example of APCo's inconsistent application of strict deadline for bid proposal forms.  No such inconsistency exists.

For all of these reasons, the court FINDS that R&R has not established element two of its *prima facie* case; it has not established that it submitted a bid meeting the GGM contract requirements.  As an *alternative* ruling, the court FINDS that, to the extent R&R met its *prima facie* case, the Defendants have met their burden of production by stating a legitimate, nondiscriminatory reason for not awarding the contract to R&R: that regardless of whether R&R's bid submission was timely, the decisionmakers believed that it was not timely based on the information on the Empotoris bid page.  Further, as an additional *alternative* ruling, for the

same reasons discussed above, the court FINDS that R&R has failed to raise a genuine issue of material fact that the legitimate reason proffered was pretext for discrimination.

The court recognizes that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be the *sine qua non* for a plaintiff to survive a summary judgment motion" in discrimination cases based on circumstantial evidence.   Rather, "[t]he critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the [defendant's] discriminatory intent.'"  *See Flowers v. Troup Cnty., Ga. Sch. Dist.,* 803 F.3d 1327, 1336 (11th Cir. 2015).  Such a triable issue of fact exists "if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith v. Lockheed–Martin.* 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting  *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011), *overruled by Ortiz v. Werner Enter., Inc.,* __ F.3d ___, 2016 WL 4411434 (7th Cir. 2016)).   On the claim of race discrimination regarding the GGM contract, the court FINDS that R&R has not pieced together such a convincing mosaic with circumstantial evidence, and has not otherwise raised a reasonable inference that Defendants intentionally discriminated against R&R on the basis of race when they made decisions regarding the awarding of the GGM contract.

Given these rulings, the court FINDS that the motion for summary judgment is due to be GRANTED as to the race discrimination claims asserted against APCo and Garrison regarding the GGM contract.

### 3.  Application of the Standard to the Greene County Contract

As to the Greene County Contract, Defendants assumed, for summary judgment purposes

only, that R&R could establish its *prima facie* case.  The court FINDS for summary judgment

purposes that R&R has met all the elements of its *prima facie* case including the presentation of

evidence that it met the requirements for the Greene County contract; unlike the GGC bidding

process, here, R&R timely presented a bid that met the requirements.  The burden, therefore,

shifts to Defendants to produce legitimate, non-discriminatory reason(s), and the court FINDS

that Defendants APCo and Garrison have done so: APCo and Garrison stated that they awarded

the contract to DKH and not R&R because DKH was the lowest priced bidder and also because

DKH's past performance demonstrated to decisionmakers Dobbs and Willingham that it was the

most qualified bidder.

Because Defendants have met their production burden, R&R has the burden to rebut each

of these reasons and raise a genuine issue of material fact that both reasons are pretextual. To

show pretext, a plaintiff must demonstrate that the defendant's "proffered reason was not the true

reason for the employment decision."  *Texas Dep't of Cmty. Affairs. v. Burdine,* 450 U.S. 248,

256 (1981).  It must "confront the [defendant's] seemingly legitimate reason for [the adverse

employment action ] 'head on and rebut it.'" *Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1206

(11th Cir. 2013) (quoting *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000)).   To

do so, it must "cast sufficient doubt on the defendant's proffered . . . reasons to permit a

reasonable factfinder to conclude that the [defendant's] proffered 'legitimate reasons were not

what actually motivated its conduct.'" *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th

Cir. 1997) (quoting *Cooper-Houston v. S. Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)).  The

plaintiff can rebut each reason by demonstrating "'such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons

for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs,* 106

F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d. Cir.

1996)).   However, a plaintiff "'cannot succeed by simply quarreling with the wisdom of that

reason . . . .'" *Kidd,* 731 F.3d at 1206 (quoting *Chapman,,* 229 F.3d at 1030).   The court's role is

not to second-guess the defendant's business decisions, but rather, is to ensure that they are not

racially motivated. *See Chapman,* 229 F.3d at 1030.

### a.  Past Performance

One legitimate reason that the Defendants proffer to the court for choosing DKH is the

longterm, positive work relationship with DKH.   APCo's relationship with one of DKH's

owners, Don Parsons, dated back to the 1990's. The Greene County plant management personnel,

Dobbs and Willingham, stated that they were not only impressed with the quality of DKH's

work, but they also liked the attitude of its workers, who always responded "yes sir" when they

asked DKH for assistance.   Further, DKH was a convenient company with which to work,

because its offices were located near the plant, which meant that it could and did respond quickly

to emergency clean-up situations.   In addition, when the Greene County plant had tried

contracting with other lawn and maintenance companies in the past, management personnel were

not as satisfied as they were with Parsons-owned companies. In two such instances, problems had

developed, and APCo turned to Parsons-owned companies to complete the contract.   Even

subtracting the months when other companies attempted to perform the Greene County plant

lawn and maintenance work, the Parsons-owned company, now DKH, was the tried and true

performer of that work for more than a decade.   The new chemical application work aside, APCo

knew how DKH had performed the work and was favorably impressed with that effort, so

impressed that its management had considered "sole sourcing" the contract to DKH.

In contrast, R&R did not receive as high marks from Dobbs and Willingham on general job performance.  Although R&R had never received the lawn and maintenance contract at the plant, APCo had awarded the janitorial services contract to it from 2006-2012.  Unlike the unqualified approval management gave to DKH's job performance, management rated R&R as generally satisfactory but also acknowledged occasional problems with job performance, and R&R had lost the plant janitorial contract to another supplier in 2012.  Therefore, at the time of the 2013 bidding on the Greene County contract, DKH was the company with the longer-standing relationship and more impressive job performance with experience performing the same tasks required in the contract except chemical application

R&R has not presented any evidence that the "positive past performance" reason for hiring DKH was not true.  It has not produced any evidence that the Greene County plant management had any negative experiences with DKH, such as evidence that APCo had disciplined DKH or had complained about its job performance, or that DKH had failed to respond with a good attitude. Having a long-standing, positive relationship with a supplier is a legitimate, nondiscriminatory reason for choosing that supplier.  *See Brown v. Am. Honda Motor Co.,* 939 F.2d 946, 951 (11th Cir. 1991) ("It is not at all improper for an employer or a business contemplating a long-term association to prefer doing business with someone with whom they are familiar . . . . On that basis alone, [the employer] could legitimately encourage them to apply and thereafter select them to run the new dealership . . . .").

The court recognizes that R&R has presented reasons, such as the lack of chemical application license at the time of bidding and the failure to figure cost-plus items when adding up

bids, to support its claim that APCo should have chosen R&R instead of DKH.  But it has not

confronted this particular reason, the "positive past performance" reason,  head-on and rebutted

it, as R&R is required to do to establish pretext.

      R&R does not appear to be arguing that it is more qualified based on past performance of

both companies at the Greene County plant.  However, to the extent, if any, that it does, this

argument is unsuccessful.  It "cannot prove pretext by simply arguing or even by showing that

[it] was better qualified than the [entity] that received the position [ ] coveted . . . [but] must

show that the disparities between the successful applicant's and [its] own qualifications were of

such weight and significance that no reasonable person, in the exercise of impartial judgment,

could have chose the candidate selected over the plaintiff." *Kidd,* 731 F.3d at 1206.  Here, the

court FINDS that R&R has failed to show such disparities.

      The court acknowledges R&R's argument that DKH was not a qualified bidder, so that

APCo should not have considered the bid in the first place; based on this argument, R&R was the

lowest *qualified* bidder.  R&R's characterization of DKH as unqualified rests upon DKH's

failure to submit its compliance form with its proposal form and to obtain the required license to

apply herbicide and pesticides before the bid deadline until after the bid deadline.  As discussed

previously, no dispute exists that APCo strictly adhered to the requirement that the proposal form

with pricing be submitted by the due date and time, and no dispute exists that DKH and R&R

timely submitted the bid proposal with pricing by the deadline of 11:00AM on October 11, 2013.

R&R's argument focused on the other forms and licenses.

      Defendants presented evidence that, although certain written language in the Inquiry

Package does require the submission of all forms and evidence of licenses with the bid proposal,

APCo's custom and practice was to be lenient about the receipt by the due date and time of all such documents **except** the proposal form with pricing.  Garrison testified in his declaration that APCo's practice was to allow late submission of all forms and licenses except the bid proposal and mentioned several examples of contractors who did not submit forms and licenses by the bid due date and were not disqualified.  His words at the pre-bid meeting appeared to focus on the "pricing portion" as the key form that APCo must receive by the deadline. (Garrison Decl. Doc. 42-8, at 13, ¶ 32).  Although R&R makes a distinction between submitting evidence of an existing license after the bid deadline and obtaining a license after the bid deadline, no evidence exists that APCo made that distinction either before or after the Greene County bid process. Rather, the consistent distinction was between the proposal form with pricing (which the supplier must submit by the deadline) and everything else (which the supplier could provide later).

In the Greene County bid process, DKH faxed the compliance form within hours of the bid deadline, and obtained the chemical application licensing within the thirty-day period that APCo gave them to do so.  APCo did not formally award the contract to DKH until it received the required chemical application license, so APCo waited to contract until it was sure that DKH was properly licensed and would be following the Department of Agriculture's rules and regulations.  APCo's willingness to wait a few weeks for DKH to obtain the license does not contradict its assertion that it had a long-standing, positive relationship with DKH and wanted to award the contract to DKH; in fact, its willingness to wait a short time while DKH obtained the license may well support the depth of the positive feeling for DKH.

R&R may quarrel with the wisdom of APCo's judgment, but this court will not;  the court's role is not to re-examine the employer's business judgments and second-guess whether

they were fair and appropriate.  *See Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir.

2000).  Rather, this court's role is to determine whether the decision on the Greene County

contract, unfair or not, was *discriminatory*.  The reason proffered—past positive performance—is

one that might motivate a reasonable employer, and R&R has presented nothing to dispute that

APCo had a longstanding relationship with DKH and was pleased with its past performance.

Nothing in the record suggested that APCo was guilty of racial animus in this decision, and, in

fact, the record reflected that, in the past, APCo had regularly awarded contracts to companies of

diverse ownership, and had awarded contracts to R&R.  For all of these reasons, the court FINDS

that R&R has failed to rebut the proffered reason, DKH's past positive performance, and has

failed to raise a genuine issue of material fact that this reason was pretext for race discrimination.

   b.  Lowest Bidder

  Because R&R must confront and rebut *each* of the legitimate reasons, its failure to rebut

the positive past performance reason means that it has failed in the pretext analysis; that reason

forms an independently adequate basis, and this court need not analyze the other legitimate

reason, which was that DKH was the lowest bidder.  *See Crawford v. City of Fairburn, Ga.,* 482

F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate,

nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for

summary judgment.").  In an abundance of caution, however, the court makes the following

ruling: the court FINDS that R&R has not raised a genuine issue of material fact that the "lowest

bidder" reason was pretext for race discrimination.  No dispute exists that DKH was the lowest

bidder on the fixed price work.  No dispute exists that R&R had lower hourly rates than DKH on

the cost-plus work, but, given that the cost-plus work was on an "as requested" basis the extent

of which was unknown at the time of bid decision, Garrison's choice not to attempt to forecast and to calculate that part of the contract does not raise indicia of race discrimination.

Once again, the court recognizes that establishing the elements of the *McDonnell Douglas* framework is not the only means of surviving summary judgment.  However, the court FINDS that R&R has not created by any other means a triable issue concerning the employer's discriminatory intent on the basis of race.  *See Flowers,* 803 F.3d at 1336.

For all of these reasons, the court FINDS that the motion for summary judgment is due to be GRANTED as to the race discrimination claims asserted against APCo and Garrison regarding the Greene County contract.

## VI.  CONCLUSION

For the reasons stated, the court WILL GRANT the motion for summary judgment in its entirety, and WILL ENTER SUMMARY JUDGMENT in favor of Defendants and against the Plaintiff.

Dated this 28th day of September, 2016.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE